## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT of TENNESSEE
## at CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | **1:24-cr-106** |
| v. | ) | |
| | ) | **Judge McDonough** |
| PATRICK BRYANT HAWLEY | ) | |

## SENTENCING MEMORANDUM AND RESPONSE TO THE DEFENDANT'S MOTION FOR A VARIANCE[1]

Before his first contact with Minor Victim, the defendant was under investigation in three jurisdictions for separate child exploitation-related offenses:

- In online messages with an undercover federal agent in Greenville, South Carolina, the defendant discussed sexual acts that he wanted to perform with the agent's notional four-year-old daughter. (R. 26, PSR at ¶¶ 31-33.)

- An investigation in Victoria, British Columbia, found messages from the defendant where he described his plans to

> get my girls, maybe a couple more, whoring to pay for a small rural property with enough space and privacy to accommodate the prostitution, . . . have a few little things kept under the radar, and expand to "specialty" prostitution for a very select list. . . . 6 good whores could produce a substantial income; add in a few ▮▮▮▮▮▮▮ and it would become insane.

(*Id.* at ¶¶ 62-63, 67; *see also id.* at ¶ 85, (the defendant describing his "dream of creating a '▮▮▮ Farm'"); *id.* at ¶ 113 (the defendant stating that he is "working

---

[1] The United States has redacted offensive facts from this Memorandum and will file a sealed unredacted version.

with a handful of female pedophiles to organize a little free-use community supported by prostitution fronted by a couple of legal businesses.").)

- And the defendant told an undercover investigator in Ontario, Canada, that he was "interested in forming a relationship with a female pedophile and that he looks forward to raising little girls to be 'happy, healthy, amoral, ███████ ████████.' He went on to say he wants to 'look a mother in the eye' as he engages in ████████████████." (*Id.* at ¶ 76.)

A week after the defendant's first contact with Minor Victim, a Federal Bureau of Investigation online covert employee observed the defendant distribute nine videos showing child sex abuse material[2] into a moderated chatroom; the videos depict victims of sexual abuse from toddler-aged to prepubescent. (*Id.* at ¶¶ 90-93.)

Despite the defendant's rampant search for children to exploit sexually, he seeks the shortest sentence that the Court may impose. (R. 33, Motion for Variance, 195-200.) The Court should decline to vary and impose a sentence that reflects the need to protect the public—especially minors—and that considers the injuries suffered by the victims of the defendant's offenses.

---

[2] The PSR alternates between *child pornography* and *child sex abuse material*. (*See, e.g.*, R. 26, PSR at ¶ 87.) *Child pornography* is defined by 18 U.S.C. § 2256(8) as "any visual depiction . . . of sexually explicit conduct, where— (A) the production of such visual depiction involves the use of a minor engaging in sexually explicit conduct; (B) such visual depiction is a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaging in sexually explicit conduct; or (C) such visual depiction has been created, adapted, or modified to appear that an identifiable minor is engaging in sexually explicit conduct." Some courts have identified the term child pornography as a "misnomer." *See United States v. Long*, 92 F.4th 481, 483 n.1 (3d Cir. 2024). And, outside the legal system, the term *child sexual abuse material*, or "CSAM," is preferred because CSAM more accurately reflects that underlying every sexually explicit image or video of a child is sexual abuse, rape, and/or exploitation. https://www.missingkids.org/theissues/csam (last visited 20 November 2025); https://www.interpol.int/en/Crimes/Crimes-against-children/Appropriate-terminology (last visited 12 November 2025). As in the PSR, *child pornography* and *child sex abuse material* are herein used interchangeably.

*The Defendant's Presentence Investigation Report*

Following the defendant's guilty plea to child exploitation, the Probation Office prepared a Presentence Investigation Report detailing the defendant's offense conduct and history. (R. 26, PSR.) The offense of conviction set a base offense level of 32. (*Id*. at ¶ 144.) The defendant's use of a computer to exploit a victim younger than sixteen years to perform sexual acts and his distribution of depictions of those acts resulted in four two-level enhancements. (*Id*. at ¶¶ 145-47, 149.) And because the defendant brought sadistic or masochistic conduct into the offense, a four-level enhancement also applied. (*Id*. at ¶ 148.) With credit for acceptance of responsibility, the defendant's total offense level is 41. (*Id*. at ¶¶ 155-57.) The defendant has no criminal convictions, which results in a criminal history score of I and a guideline range of 324 to 405 months, limited by statute to 324 to 360 months. (*Id*. at ¶¶ 177-79, 228.)

*A sentence of 324 months is appropriate.*

The sentencing factors listed at 18 U.S.C. § 3553(a) support a sentence of 324 months' incarceration. Foremost among the factors driving the defendant's sentence is the need to protect the public, especially children, and the seriousness of his offense.

The Need to Protect the Public. "The court, in determining the particular sentence to be imposed, shall consider the need for the sentence imposed to protect the public from further crimes of the defendant[.]" 18 U.S.C. § 3553(a)(2)(C) (cleaned up). "It [i]s within the court's discretion to emphasize the need to protect young children." *United States v. Brown*, 579 F.3d 672, 687 (6th Cir. 2009) (citing *New York v. Ferber*, 458 U.S. 747, 761 (1982) (acknowledging that there is a particularly compelling interest in prosecuting and punishing offenders that sexually exploit children)). The defendant told Minor Victim that

"no age was too young for his desire for sexually explicit conduct" (R. 17, Plea Agreement at 59), and, in the investigations listed above, the defendant was actively seeking to have sex with a four-year-old and with a pedophile's "little girl," and he expressed a desire to turn out pre-teen prostitutes. The defendant lives his belief that "its actuslly better for the child have very early sexuslexperiences." (R. 26, PSR at ¶ 31.)[3]

In searching for children to sexually abuse, the defendant often tried to recruit the mothers of young children. Thinking he was talking to a like-minded person when he was chatting with the undercover agent in Greenville, the defendant stated that he was also messaging with a woman who professed to be a pedophile, and he then asked of the agent, "Would you enjoy directing us as we ███████████████████████████████ ███████████████?" (*Id*. at ¶ 33; *see also id*. at ¶ 32.) In the Victoria investigation, the defendant explained, "I'd love whatever, but especially pedomommies ████████, with their littles or just watching CP, and directing the action." (*Id*. at ¶ 73.)[4] To others, the defendant presented as one who could help women overcome their discomfort with pedophilia. When asked if he had ever successfully taught a pedomom to act, the defendant advised, "Yes. Several Times." (*Id*. at ¶ 80.) And he then provided a concrete example. (*Id*.)

Nor were these fantasies; to the undercover in the Ontario investigation, the defendant admitted to "an indecent act, namely he had sex with his ████████, while ██ ████████████████████████████████." (*Id*. at ¶ 82.)[5] He added that his ████████

---

[3] Consistent with the PSR, the United States will not correct the defendant's typographical errors.

[4] A *pedomom* is a female pedophile, often with children of her own. *See*, *e.g.*, *United States v. Harp*, No. 1:23-CR-69 (N.D.W.V. Dec. 9, 2024), available at 2024 U.S. Dist. LEXIS 222685 *7 n.5 and 2024 WL 5057194 *2 n.5. "CP" is shorthand for *child pornography*.

[5] In his motion for a variance, the defendant cites to paragraph 82 as proof of his expression of "genuine regret for his actions[.]" (R. 33, Motion for Variance at 199.) The United States sincerely hopes that this citation was in error, as paragraph 82, quoted herein, describes the defendant's and his ███████████████████████████.

███████████ and that he, too, "███████████████████████████." (*Id*. at ¶¶ 82-83 (quoting the defendant).) The undercover asked whether the defendant was nervous about his craving for sex with children, and the defendant explained that the reward outweighed the risks. (*Id*. at ¶ 86.) And just before his arrest, the defendant told an undercover agent, "I'm glad I'm not in custody right now for following my ██ around." (*Id*. at ¶ 120.) In other words, the defendant understood the consequences of his actions and yet continued to seek child victims to abuse.

Not only did the defendant cast a wide net searching for children he could sexually abuse, but he was bold in his search (which is consistent with the defendant's view on risk/reward described above). Frequently, the defendant detailed his desire to have sexual contact with children and then messaged a picture of his Tennessee identification or of his office. (*See*, *e.g.*, *id*. at ¶¶ 32, 79, 99, 117.) Similarly, his social media platforms often bore his given name, and he freely shared his true name during discussions related to sex with children. (*See*, *e.g.*, *id*. at ¶¶ 32, 41, 77, 81, 99.) By sharing his true name, the defendant asserted he was building trust with those whom he believed could feed his desires for sex with children. But that same nerve shows how truly unencumbered the defendant is by the exposure of his desires and the injuries those desires wrought.

Furthermore, the defendant desired to be a hands-on offender. During his interaction with Minor Victim, the defendant made plans to visit her in Pennsylvania. (*Id*. at ¶ 133.) And, though the "cabin weekend" did not materialize, this plan further illustrates his threat to children. There, the defendant rented a cabin for pedophiles or pedophile-friendly attendees who would "congregate to watch porn together, begin ████████████

████████████████████████████████████████████

██████████ perverts just like us." (*Id*. at ¶ 87.)  Though only four persons confirmed their attendance, one of those was to bring ████████████: "the girls who were coming are going to want to ████████████████████. . . .  That ██'s gonna drive me wild . . .  But I am also really looking forward to ████████████." (*Id*. at ¶ 89.)

The defendant impudently presents as a danger, and the Court's sentence must consider the need for the sentence imposed to protect the public from further crimes of the defendant.

The Nature and Circumstances of the Offense.  "The court, in determining the particular sentence to be imposed, shall consider the nature and circumstances of the offense[.]"  18 U.S.C. § 3553(a)(1) (cleaned up).  Here, the plea agreement and the PSR accurately describe the defendant's offense conduct.  (*See* R. 26, PSR at ¶¶ 21-30, 124-33.)

For about six weeks in 2024, the defendant communicated with Minor Victim, a fourteen-year-old female, directing her to engage in lewd conduct and lascivious exhibitions that included "masturbation, sadistic or masochistic sexual abuse, or a lascivious exhibition of the genitals or pubic area of Minor Victim."  (R. 17, Plea Agreement at 60.)  "[T]he defendant demanded that Minor Victim orgasm every day" and that he "'get at least one naughty pic[,]'" prompting Minor Victim to send images and videos of her exposed breasts, of her exposed vulva, and of her using a sex toy.  (*Id*. at 59-60.)  In all, Minor Victim sent more than twenty images and more than twenty videos of herself that meet the statutory definition of "child pornography."  Throughout, the defendant encouraged Minor Victim to test her boundaries as she produced child sex abuse material for him: "Get brave and show me something honestly, the #1 thing you need to be a whore is you need bravery, you just need a little courage right" (R. 26, PSR at ¶ 124); "I got a special request for your daily child

porn from a lesbian pedophile" (*id*. at ¶ 128); and "Now be sure that you get back to sending your daddy something nasty every single day, all right you dumb ████████" (*id*. at ¶ 131).

Included in the offense conduct described above is the defendant's inducement of Minor Victim to record herself in sadistic and masochistic videos, as described in the Response to the Defendant's Objection to the Presentence Investigation Report. (R. 31, Response (sealed).) There, Minor Victim experienced pain as she struggled to ████████ ████████████████████████████████████, as directed by the defendant.[6]

For this offense conduct, the PSR has correctly calculated a total offense level of 41. (R. 26, PSR at ¶ 157.)

Seriousness of the Offense and Just Punishment. But the nature and circumstances of the offense conduct as described above simply do not capture the seriousness of the defendant's offense. In addition to inducing and coercing Minor Victim to produce and send images and videos of child sex abuse material to him, the defendant sent to Minor Victim "images and videos of himself masturbating and of other minors engaging in sexual acts and bestiality." (R. 17, Plea Agreement at 59.)[7] And he distributed the images and videos that he received from Minor Victim to others in the child sex abuse world. (R. 26, PSR at ¶ 132.)

"The court, in determining the particular sentence to be imposed, shall consider the need for the sentence imposed to reflect the seriousness of the offense . . . and to provide just punishment for the offense[.]" 18 U.S.C. § 3553(a)(2) (cleaned up). A sentence that does not

---

[6] The United States seeks to clarify the description in the Response that "she did not have the camera focused on her face." (R. 31, Response at pages 4 and 5.) These statements are meant to describe that Minor Victim's face is not in focus in the video.

[7] To be clear, the defendant sent three sets of indecent material: (1) images and videos of himself masturbating, (2) images and videos of other minors engaging in sexual acts, and (3) images and videos of bestiality. (R. 26, PSR at ¶ 123.) He did not send depictions of minors engaging in bestiality.

recognize the harm inflicted on crime victims does not adequately reflect the seriousness of the offense. *United States v. Bistline*, 665 F.3d 758, 764-66 (6th Cir. 2012). And a just punishment should likewise reflect the severity of the crime on its victims. *United States v. Denny*, 653 F.3d 415, 420-21 (6th Cir. 2011); *United States v. Stewart*, 628 F.3d 246, 260-61 (6th Cir. 2010).

The defendant did not save Minor Victim's CSAM for himself but shared it with other pedophiles: the defendant told Minor Victim, "I love showing" the images and videos Minor Victim sent him "to pedophiles online[.]" (R. 26, PSR at ¶ 132.) And he sent screenshots of his conversations with fellow pedophiles to Minor Victim. The defendant even encouraged Minor Victim to share those images and videos with others: "And I want you to know that I actually want to encourage you to share your body with as many pedophiles as possible." (*Id.*) Consequently, more than just the defendant viewed the material that Minor Victim created; every time another pedophile views child sex abuse material depicting Minor Victim, she suffers a revictimization, and the defendant aided and encouraged that revictimization. *See* https://www.missingkids.org/theissues/csam ("Not only do these images and videos document victims' exploitation and abuse, but when these files are shared across the internet, child victims suffer re-victimization each time the image of their sexual abuse is viewed.").

The defendant possessed more than just material featuring Minor Victim: he possessed additional images and videos of child sex abuse material, and he moderated platforms that facilitated and allowed others to distribute CSAM. To join his chat room, a person would have to upload child sex abuse material that is unmistakably hardcore and depicting victims between a newborn and ten years old. (R. 26, PSR at ¶ 33; *see also id.* at

¶ 32 (the defendant "stated he was vetting users for a chat group that he is in and later messaged, 'Well, the room is all CP newborn to 17/364.'").)  Foreign law enforcement observed the defendant in a similar chat room, where he stated, "Well I hope you're recording it all, because there's a real dearth of ███████████ out there."  (*Id*. at ¶¶ 36, 39.)  And in the Victoria case, the defendant wondered, "And I don't even know if there's any out there, but have you ever seen any ████████████████?"  (*Id*. at ¶ 73.)  In making these statements, the defendant created a risk that someone would work to make available CSAM featuring the ████████████████████████████████████████, victimizing more children.

In addition to moderating his own chat room, an online covert employee with the FBI was monitoring a social media platform and observed the defendant distribute CSAM, which allowed the defendant to join a restricted space on the platform.  (*Id*. at ¶ 90.)  Once there, the defendant observed CSAM featuring ████████.  (*Id*.; *see also id*. at ¶¶ 100-04.)

The defendant did not stop with exploitation of Minor Victim; he distributed her material, and he enabled the exchange of other, similar, materials.  "That the producers of child pornography are more culpable, however, does not mean that its knowing and deliberate possessors are barely culpable at all."  *Bistline*, 665 F.3d at 765.  The defendant is both.

Deterrence.  "The court, in determining the particular sentence to be imposed, shall consider the need for the sentence imposed to afford adequate deterrence to criminal conduct[.]"  18 U.S.C. § 3553(a)(2)(B) (cleaned up).  "General deterrence is crucial in the child pornography context[.]"  *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010) (citing *United States v. Goldberg*, 491 F.3d 668, 672 (7th Cir. 2007) ("The logic of deterrence suggests that the lighter the punishment for downloading and uploading child

pornography, the greater the customer demand for it and so the more will be produced.") and *United States v. Goff*, 501 F.3d 250, 261 (3d Cir. 2007) ("deterring the production of child pornography and protecting the children who are victimized by it are factors that should [be] given significant weight at sentencing")). Undoubtedly, general deterrence is an important factor for the Court, and a sentence including lengthy incarceration will meet the need of this sentencing factor.

History and Characteristics. "The court, in determining the particular sentence to be imposed, shall consider . . . the history and characteristics of the defendant[.]" 18 U.S.C. § 3553(a)(1). The defendant has no convictions for any criminal offense—a favorable factor that the Court should consider—but the Court must balance this factor against the defendant's characteristics. The record shows that he was engaged in activity like his offense of conviction for many years.

When asked about his history of sexual contact with minors, the defendant answered, "I used to babysit ███████████ when I was 10, 11, 12, and spend a lot of time ███████████, lol" (R. 26, PSR at ¶ 31.) And as part of a 2019 criminal investigation in Nebraska, law enforcement observed that the defendant was planning a party like the cabin weekend described above; he invited multiple persons to this party, including a woman who would bring her ███████████. (*Id.* at ¶¶ 160, 174.)

Near the end of the local HSI investigation, federal law enforcement introduced an FBI online covert employee with the moniker "Chris" to the defendant through an online social messaging application. (R. 26, PSR at ¶ 108.) The defendant volunteered to Chris, "I'm really mainly into pedomoms, but you can't have a pedo mom without littles, and I'd have to say I prefer girls by far, and it's far sexier to see a mommy ███████████

████████████████████████████████████████████████████

████████████████.” (*Id.* at ¶ 109.) Chris, acting in his undercover role, informed the defendant of a plan to ask "Lisa"—also an FBI online covert employee who presented with a notional six-month-old child—to record sexual abuse of the child in exchange for money. (*Id.* at ¶ 110-11.) The defendant responded, "I'd love a video of her playing with her baby! Again, glad to go halvsies with you on that, and you should ask if she's ever let her baby ████████████████. Strangely, women never seem to think of that." (*Id.* at ¶ 111.) When Chris agreed to ask Lisa to make that video, the defendant replied, "Perfect! Thanks man! This is the greatest thing ever!" (*Id.*) Having Lisa make the video was not all that the defendant wanted, however; "Personally, I just want to ████████ ████████████████ . . ." (*Id.*)

For too long, the defendant has exploited children like Minor Victim without consequence. That he does not have a criminal conviction should not mitigate his longstanding threat.

*The Court should not vary.*

The defendant moves for a variance to a sentence of fifteen years. (R. 33, Motion for a Variance, 195-201.) However, fifteen years represents the shortest sentence permitted by statute for sexual exploitation of children. In other words, had the defendant stopped his text exchange with Minor Victim after he had received the first image she sent—that is, on the first day—the minimum sentence would apply (and his guideline range would be 135 to 168 months). A fifteen-year sentence fails to account for the defendant's distribution of Minor Victim's material; overlooks the sadistic demands that the defendant made of Minor Victim; ignores that the defendant encouraged others to produce "████

███████████████████████████; and disregards the defendant's unchecked search for children that he could sexually abuse. The need to protect the public—by itself—supports a sentence well above the mandatory minimum set by Congress. The damage inflicted on Minor Victim and the other children depicted in the materials that the defendant distributed and helped to be distributed warrants an even longer sentence. A fifteen-year sentence is not "consistent with the purposes of § 3553(a)" (*see id*. at 195), and the extent of the requested variance is not supported by the defendant's motion. *United States v. Grossman*, 513 F.3d 592, 596 (6th Cir. 2008) (*Gall* "permits district and appellate courts to require some correlation between the extent of a variance and the justification for it.") (citing *Gall v. United States*, 552 U.S. 38, 46 (2007) ("a district judge must give serious consideration to the extent of any departure from the Guidelines and must explain his conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications."); *see also United States v. Musgrave*, 761 F.3d 602, 608 (6th Cir. 2014) ("In imposing a sentence, the district court must explain, based on permissible considerations, how its sentence "meshe[s] with Congress's own view of the crimes' seriousness.'") (quoting *United States v. Peppel*, 707 F.3d 627, 636 (6th Cir. 2013)) (alteration in *Musgrave*).) The Court should deny the defendant's motion for a variance.

The defendant argues that the parsimony principle supports a variance. (R. 33, Motion at 198-200.) The parsimony principle—that is, a sentence must be "sufficient, but not greater than necessary, to comply with" the needs for the sentence imposed, 18 U.S.C. § 3553(a)(2)—is a broad command that is immediately followed by a list of narrow factors that the Court must consider. As recounted throughout this memorandum,

the defendant's sentence should consider the nature of the offense and the defendant's history, and the sentence must reflect the seriousness of the offense and the overwhelming need to protect the public. That sentence is 324 months and would fully observe the need for a sentence sufficient, but not greater than necessary, for this defendant.

The defendant asserts that his offense "was not born of predation or violence[.]" (*Id.* at 196; *see also id.* at 198 (touting "no physical contact, threat, or violence.").) But this claim discounts the fact that he was actively trolling in Canada, New York, South Carolina, and here, in both Tennessee and Georgia, for children to abuse. And that his demand to Minor Victim—"Rape yourself with ███████ you dumb ██████ whore"—induced her to commit a violent act on herself. (R. 31, Response; R. 31-1, Exhibit at page two.) Moreover, had his communications with Minor Victim continued, the defendant was planning to visit her in Pennsylvania. The defendant is, in fact, a predator and an offender that desires to be hands-on, and the Court should punish him as such.

Finally, the defendant claims that the "consequences" of his offense "have been severe[]": he "has lost his law license, his livelihood, and his standing in the community. His family's name has been publicly shamed, and his parents have borne emotional pain they could never have imagined." (R. 33, Motion at 198.) Still, once the Court sentences the defendant, those consequences will have an endpoint, while Minor Victim will have to live with the shame of his actions for the rest of her life. Besides, a law license, a livelihood, and standing in the community are marks of a privileged background, as are the defendant's youth on Lookout Mountain and education in a private school. Criminals with privileged backgrounds are not more entitled to leniency.

> The collateral consequences of the defendant's prosecution and conviction are "impermissible factors" when fashioning a sentence that complies with [18 U.S.C. § 3553(a)(2)]. *Peppel*, 707 F.3d at 636. A district court's reliance on these factors "does nothing to show that [the defendant's] sentence reflects the seriousness of his offense. Were it otherwise, these sorts of consequences—particularly ones related to a defendant's humiliation before his community, neighbors, and friends—would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines." *United States v. Bistline*, 665 F.3d 758, 765-66 (6th Cir. 2012). Thus, when a district court varies downward on the basis of the collateral consequences of the defendant's prosecution and conviction, the defendant's sentence will not reflect the seriousness of the offense, nor will it provide just punishment. *See Peppel*, 707 F.3d at 636; *Bistline*, 665 F.3d at 765-66.

*Musgrave*, 761 F.3d at 608 (citing *Peppel*, 707 F.3d at 636 (second alteration in original)).

Finally, the defendant asserts "he has expressed genuine regret for his actions and awareness of their impact[.]" (R. 33, Motion at 199.) But a large part of his argument for a variance focused on his "isolation" and "[t]he abandonment by his wife in 2017" as the "catalyst for many of his future problems." (*Id*. at 196.) Outward-looking blame is not consistent with true remorse. A minimum sentence fails to serve any legitimate purpose.

### Conclusion

The defendant's abuse of Minor Victim and his wide-ranging search for additional victims warrant a sentence of 324 months. The need to protect the public and to provide just punishment, the seriousness of the offense, and the offense conduct more than support this sentence, and the defendant's lack of criminal history does not provide sufficient mitigation for a lesser sentence. In addition, a lifetime term of supervised release would further protect the public and provide the defendant a reasonable and controlled return to society. (R. 26, PSR at ¶ 230.) Finally, as agreed to by the defendant, the victims of his

charged offenses are due restitution (R. 17, Plea Agreement at 64-65) and a special assessment of $5,100.00 is appropriate (R. 26, PSR at ¶ 239). The severity of the defendant's offense and the danger he presents to the public—especially to minors of any age—requires nothing less.

Respectfully submitted, this the 20th day of November 2025.

FRANCIS M. HAMILTON III
United States Attorney

By: _____
Jay Woods, TN BPR 021768
Assistant United States Attorney
1110 Market Street, Suite 515
Chattanooga, Tennessee 37402
Jay.Woods@usdoj.gov
(423) 752-5140